Filed 10/31/23  P. v. Allen CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

|  |  |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　v.<br><br>MARJON ALLEN,<br><br>　　　Defendant and Appellant. | B312097<br><br>(Los Angeles County<br>Super. Ct. No. BA460946) |

　　　Appeal from judgment of the Superior Court of Los Angeles County, Kathleen Kennedy, Judge.  Affirmed.

　　　The Law Office of J. Blacknell and Kellen I. Davis for Defendant and Appellant.

　　　Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Rama R. Maline, Deputy Attorneys General, for Plaintiff and Respondent.

_____

In August 2017, surveillance camera footage captured an individual exit his vehicle and fatally shoot Kevin Williams (Williams) and Dewayne Childs (Childs) as they walked near 1019 East 84th Place in Los Angeles, California.

Detectives could not determine the shooter's identity from the footage alone, and they located no eyewitnesses to the crime. The shooter's vehicle, however, was distinctive, and detectives obtained additional surveillance footage that captured the vehicle driving toward the scene of the shooting and subsequently fleeing. With the exception of the driver's hand on the steering wheel, the additional surveillance footage did not capture any images of the driver. But the footage and the murder vehicle's distinctive characteristics nonetheless permitted detectives to determine that Erin Baylor (Baylor) owned the vehicle.

Through subsequent investigation, detectives learned that Baylor's boyfriend, appellant Marjon Allen (Allen), had regular access to Baylor's car. In addition, Allen's Facebook records, tattoos, and other evidence suggested he was an active member of the Rolling 30s Crips gang. And tattoos on the body of victim Williams suggested that he was a member of the rival Rolling 20s Bloods gang. Finally, with assistance from the Federal Bureau of Investigation (FBI), detectives obtained an analysis of the location of Allen's cell phone on the date of the shooting. The analysis placed Allen's phone within the range of a surveillance camera that captured Baylor's vehicle fleeing the scene approximately five minutes after the shooting.

Based on this evidence, the District Attorney's Office charged Allen with the murders of Williams and Childs. The charging document included allegations that Allen committed the murders for the benefit of a criminal street gang within the meaning of Penal

Code section 186.22, subdivision (b).[1]  The jury convicted Allen on both murder counts, but found "not true" the gang enhancement allegations.  The trial court imposed a sentence of 150 years to life.

Allen now asks us to reverse his convictions, advancing four arguments.  First, Assembly Bill No. 333's (2021–2022 Reg. Sess.) amendments to section 186.22 render certain gang-related evidence introduced at trial inadmissible.  Second, the trial court improperly admitted the report documenting the FBI's cellular site analysis because the agent who prepared the report did not testify at trial.  Third, the prosecution failed to introduce sufficient evidence to support the jury's verdicts.  Fourth, the trial court erred in denying Allen's section 1118.1 motion for a judgment of acquittal.  And fifth, the court erroneously denied Allen's motion for a new trial.

We conclude, however, that Allen is not entitled to relief.  Allen fails to demonstrate any prejudice from the admission of the challenged gang and cell site analysis evidence.  And while we agree the evidence of Allen's guilt was not overwhelming, we find that the prosecution presented sufficient evidence to permit a rational trier of fact to return guilty verdicts.  Finally, we are unpersuaded by Allen's arguments challenging the trial court's denial of his section 1118.1 and new trial motions, as they depend largely on the same arguments he raises concerning the admissibility of the gang and cell site evidence, as well as the sufficiency of the evidence as a whole.

Accordingly, we affirm the judgment.

---

[1] All subsequent unspecified statutory references are to the Penal Code.

3

# FACTUAL SUMMARY AND PROCEDURAL HISTORY[2]

## A. *The Shooting*

On August 17, 2017, at approximately 1:32 p.m., a surveillance camera captured footage of a gray or silver sedan approaching Childs and Williams as they walked along East 84th Place in Los Angeles, California. The car stopped near 1019 East 84th Place, and the driver exited the vehicle and opened fire, striking and killing both men. Law enforcement did not locate any eyewitnesses who observed the shooting. A subsequent autopsy confirmed that Childs died from a gunshot wound to the back, and Williams died from a gunshot wound to the chest.

## B. *The Trial*

On September 6, 2017, authorities arrested Allen and his girlfriend of three years, Baylor, in connection with the shooting. The District Attorney's Office subsequently charged Allen[3] with two counts of murder (§ 187, subd. (a)) (counts 1 and 2) and one count of possession of a firearm by a felon (§ 29800, subd. (a)(1)) (count 3). The information alleged further that Allen had used a firearm in committing the murders (§ 12022.53, subds. (b)–(d)), and that all three alleged crimes were "committed for the benefit of, at the direction of, and in association with a criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by gang members" (§ 186.22, subd. (b)(1)).

---

[2] We summarize here only the facts and procedural history relevant to our resolution of this appeal.

[3] The District Attorney's Office did not charge Baylor in connection with the shooting.

At the September 2019 trial in the case, the prosecution presented several categories of evidence rebutting Allen's contention that detectives has misidentified him as the shooter, including: (1) surveillance footage and eyewitness testimony identifying Baylor's silver Toyota Corolla as the murder vehicle, (2) testimony and Facebook records establishing Allen's regular access to Baylor's car, (3) testimony and Facebook records suggesting Allen's membership and active involvement in the Rolling 30s Crips gang, as well as testimony indicating that victim Williams was a member of the rival Rolling 20s Bloods gang, and (4) cell site analysis (a) placing Allen's cell phone within the range of a surveillance camera 1.5 miles from the crime scene approximately five minutes after the shooting, and (b) suggesting that Allen's phone continued traveling west—in the same direction as Baylor's vehicle—after the shooting.

The defense focused its trial presentation on two categories of evidence produced by the prosecution: (1) eyewitness testimony and photographic evidence describing the person driving Baylor's car on the day of the murders as "light-skinned," and (2) DNA evidence obtained from a lip balm recovered from the scene of the shooting that did not match Allen's DNA, but did match another, unidentified male.

### 1. *Evidence identifying Baylor's car as the murder vehicle*

The prosecution introduced several surveillance videos obtained from cameras at five different addresses. One video captured the shooter's vehicle approximately half a mile from the crime scene in the minutes prior to the murders, and another video captured the shooting itself. The remaining videos captured the vehicle driving away from the scene of the shooting, eventually heading west. The shooter is visible, but not identifiable, in the

5

video of the murders. In one other video, the driver's hand is visible on the car's steering wheel. None of the remaining surveillance videos captured an image of the driver.

The gray or silver sedan in the surveillance footage had several distinctive features: (1) an uber sticker and a vehicle service sticker placed prominently in the lower right portion of the front windshield, (2) very dark, tinted windows, (3) visible damage to the front passenger door, and (4) paper license plates. Baylor testified at trial that these features all matched her own 2017 silver Toyota Corolla.

In addition, the prosecution offered testimony from two eyewitnesses, Jonathan E.[4] and Cherri Davis, who observed the sedan driving away from the scene of the shooting. Jonathan E. testified that the car was a "newer model" white Toyota Corolla— a description that (with the exception of color) matched Baylor's vehicle. Jonathan testified further that he "was only able to see the figure of the driver," did not observe the driver's race, ethnicity, or hair color, and did not observe a passenger in the car.

Cherri Davis (also known as Cherri Brown) testified that she was walking south on Wadsworth Avenue just north of 84th Place when she heard gunshots. She then saw a "grayish[,] brownish . . . newer car" come out of an alley and head south toward 85th Street. She testified further that both victims lived in the neighborhood where she had observed the car, that she had attended high school with Williams, and that Childs was one of her best friends.

A field interview card prepared by Officer Ramon Lomeli— one of the first officers to respond to the crime scene—reflected that,

---

[4] Because Jonathan E. was 15 years old at the time he testified, the record identifies him only by his first name and the first initial of his last name.

6

on the date of the shooting a "Terry Brown" stated that the driver of the suspect vehicle was "a possible male Hispanic." In addition, the day following the shooting, Davis told detectives in a recorded interview that she had seen the vehicle's driver and, while she "didn't know if he was Mexican or Black[,] . . . [h]e was light[-]skinned." At trial, however, Davis denied making any such statements.

### 2. *Testimony concerning access to Baylor's vehicle*

The prosecution also presented several pieces of evidence concerning Allen's access to Baylor's car.

Detective Gabriel Ruiz, one of the lead detectives on the case, testified that when he first interviewed Baylor, she told him that she and Allen were the only people who drove her car. She made this statement before Detective Ruiz had disclosed to her that he was conducting a murder investigation.

At trial, however, Baylor testified that people in addition to Allen had access to her car, including her mother, her sister, and her female cousin. She testified further that her sister's boyfriend and her cousin's boyfriend "probably" drove the car "like once or twice."

Baylor initially testified that she believed she had driven herself to work in Culver City on the day of the murders—implying that her car necessarily must have been in Culver City, far from the murder scene, at the time of the shooting. But when the deputy district attorney presented her with a Facebook post indicating she had been in Compton (also a significant distance from the murder scene) on the date of the shooting, she testified that the Facebook post was accurate.

Finally, the prosecution introduced three additional pieces of evidence concerning Allen's access to Baylor's car: (1) a traffic

7

citation issued to Allen while he was driving the car on June 13, 2017 (approximately two months before the shooting), (2) multiple messages sent from Allen's Facebook account to other Facebook users between May and June 2017 in which the user of Allen's account states he is driving a " 'gray Toyota,' " and (3) a photograph of Allen posted on Facebook standing next to a silver Toyota Corolla with paper license plates.

### 3.    *Gang-related evidence*

In support of its theory that Allen committed the shooting due to a gang rivalry, as well as to prove the gang enhancement allegations charged, the prosecution introduced several categories of gang-related evidence at trial.

First, the prosecution presented evidence concerning the rivalry between the Crips and Bloods gangs, including a map and testimony regarding their respective territories. Officer Daniel Hoops, the prosecution's expert on the Rolling 20s Bloods gang, testified that the Rolling 30s Crips feud with the Rolling 20s Bloods, and that the rivalry has resulted in "several assaults[,] shootings, as well as homicides." Officer Eli Huacuja, an expert on the Rolling 30s Crips gang, testified that the Rolling 30s Crips also feud with the Swan Bloods because they are another Bloods gang. He testified further that the shooting here occurred within the Swan Bloods' territory.

Second, the prosecution offered evidence supporting Allen's active membership in the Rolling 30s Crips gang and his desire to harm members of rival Bloods gangs. Officer Huacuja opined that Allen was a member of the Rolling 30s Crips gang. He testified that when he met Allen in May 2017, Allen was in the presence of "three other Rolling 30[s] [Crips] gang members." He testified further that Martin Luther King Park in Los Angeles is a regular

8

Rolling 30s Crips "hangout," and Baylor, Allen's girlfriend, testified that she and Allen sometimes spent time at that park.

Officer Huacuja also testified that Allen's tattoos—including the clover tattoo on Allen's neck—demonstrated his membership in the Rolling 30s Crips gang, as did a number of photographs posted to Facebook showing Allen making gang signs. And he opined that photographs showing Allen wearing a Minnesota Twins baseball cap bearing a "TC" logo were consistent with his gang membership because "TC" stands not only for "Twin City," but also "Thirty Crips."

Finally, Officer Huacuja testified concerning the meaning of gang-related abbreviations and terminology used in posts on Allen's Facebook account. He explained that references to "BK" on Allen's Facebook page stood for "Blood Killer." "DG," he explained—an abbreviation that appeared in many of Allen's posts—referred to "Dirt Gang," a group within the Rolling 30s Crips gang. And Officer Huacuja testified that the "Oak PARC[s]" in the following Facebook post from Allen's account referred to the Northern California-based Oak Park Bloods gang:

"Ima catch one of these oak PARC[s] . . . . and beat the shit out of 'em. [I]t's not a fuccing game."[5]

Third, the deputy district attorney offered evidence supporting that Williams was a member of the rival Rolling 20s Bloods gang. Officer Hoops testified that victim Williams's tattoos—including the "2" and "0" on his right and left shins—were consistent with membership in the Rolling 20s Bloods. Officer

---

[5] The prosecution also introduced a post made by Allen's Facebook account four hours after the "Oak Park" post in which the user of the account writes, " 'o[n ]m[y ]w[ay] 2k Sacramento.' "

9

Huacuja also opined that Williams was a Rolling 20s Bloods gang member based on his tattoos.

Fourth, and finally, the prosecution introduced evidence specific to proving the gang enhancements charged under section 186.22. To establish that the Rollings 30s Crips met the definition of a criminal street gang, the prosecution offered two prior convictions—one for possession of a firearm by a felon and one for robbery—of individuals that Officer Huacuja testified were Rolling 30s Crips gang members. Officer Huacuja opined further that a crime similar to the one committed here "would be committed for the benefit of a criminal street gang with the specific intent to further, promote or assist in criminal conduct by gang members."

### 4. *Cell site analysis evidence*

The prosecution introduced at trial AT&T's call detail records for Allen's phone number—i.e., records of the date, time, and duration of phone calls and texts to and from his phone, as well as information concerning the location of the specific cell tower utilized to complete each call or text.

The prosecution also introduced a four-page report prepared by FBI Special Agent Michael Easter, a member of the FBI's Cellular Analysis Survey Team (CAST). The report contained a cover page, a one-page summary of the methodology Agent Easter used in analyzing the call detail records, another page consisting of two graphics depicting examples of cell towers and their "sector orientations," and a one-page map reflecting Agent Easter's conclusions concerning the approximate location of Allen's cell phone following the shooting.

The map indicated that, at approximately 1:37 p.m.—five minutes after the shooting—Allen's phone connected with a cell tower located approximately twelve streets to the west of the

10

crime scene.  This connection coincided with surveillance video that captured Baylor's vehicle driving west, away from the scene of the shooting, at approximately 1:37 p.m.  The map also reflected the approximate location of Allen's phone (even further west from the crime scene) when his phone made additional calls at 1:54 p.m. and 1:58 p.m.

Because Agent Easter had a scheduling conflict, Special Agent Meredith Sparano—another FBI CAST agent—testified concerning the call detail records.  She stated that she personally analyzed the records, with a particular emphasis on calls placed between 1:00 p.m. and 2:00 p.m. on the date of the shooting.  She testified further that she conducted her own analysis of the data and conclusions in Agent Easter's report, and that she agreed with the report's conclusions:  "I conducted my own peer review [of the report] using a different mapping software to ensure that it came up with the same conclusions."

Using the graphics in Agent Easter's report as demonstratives, she explained that call detail records identify the "azimuth, or sector," of the cell tower through which a logged call connects:  "So your sector—there's typically three sectors of a tower—are 120 degrees.  That's going to be the center point. And 60 degrees off of those will be your pie wedge to what side of the tower that cell phone is going."  She explained further that, based on the call detail records, "[a]t 1:37:25 p.m., [Allen's phone] . . . hit on cell tower with a cell I.D. of 4271 on an Eastern-facing sector.  That was an azimuth of 100.  So the user of that phone was in the vicinity of the coverage area for the eastern facing sector of that tower.  Then at 1:54 p.m. and 1:58 p.m., cell site activations were in the Northern facing sector.  That was a 350-degree azimuth for cell I.D. 24683."

11

Based on her analysis, Agent Sparano ultimately concluded that the call detail records were "consistent with a person [in possession of Allen's phone] driving west past the 110 [freeway] and Manchester at 1:37 [p.m.]"—i.e., the location of the security camera 1.5 miles from the shooting that captured Baylor's car at approximately 1:37 p.m. She concluded further that the call detail records were consistent with that same person "then continuing to drive west to an area closer to Manchester and Van Ness and then making a call there at 1:54 p.m." Finally, Agent Sparano concluded that the cell site analysis was inconsistent with Allen's phone being in his residence at the time of the 1:37 p.m. call: "It would not be consistent. So that address[, 1121 East 113th Street,] is actually about five miles southwest of [the relevant cell] tower location."

Agent Sparano conceded, however, that sector identifications, including those in Agent Easter's map, "just . . . show approximations." She explained that, in selecting a tower for connection, "our phone is trying to select the clearest, strongest signal," and "typically that's going to be the tower that it's closest to . . . [¶] . . . [¶] . . . however that's not always the case due to natural landscapes, if there's buildings that are shooting up." But even if a phone does not connect to the tower closest to it, Agent Sparano testified that in a dense urban environment like Los Angeles, she would not expect "a cell phone to connect with a cell tower that was a couple miles away where there were multiple cell towers in between that tower and the phone."

On cross-examination, Agent Sparano agreed that the 1:37 p.m. call from Allen's phone did not appear to have connected to the cell phone tower (represented by a blue dot on Agent Easter's map) closest to the surveillance camera that captured video of Baylor's car at approximately 1:37 p.m.

12

### 5. *DNA Evidence*

Detectives recovered 9-millimeter shell casings,[6] a lip balm, and a matchbook from the scene of the shooting. They attempted to test each item for deoxyribonucleic acid (DNA) evidence, but none contained a DNA sample sufficient to permit analysis by the Los Angeles Police Department's laboratory.

One of the investigating detectives, however, theorized that the lip balm might have fallen from the shooter's car when he exited the vehicle. Detectives therefore sent the lip balm to an outside lab for DNA testing using a more sensitive technique. The outside lab was able to perform a DNA analysis and concluded that Allen's DNA was not present in the lip balm. Instead, the DNA retrieved from the lip balm was consistent with an unidentified male.

The defense argued at trial that this DNA analysis eliminated Allen as a potential suspect. The prosecution responded by introducing footage from the body camera of one of the officers who responded to the scene of the shooting. Detective Ruiz testified that the footage captured an unidentified male picking up from the gutter and then tossing into the scene an item that might have been the lip balm. The deputy district attorney then argued in closing that "the placement of [the] lip balm is . . . not even consistent with having been dropped by the shooter." "I think that for whatever reason, before the police got there this guy sees this lip balm in the gutter. Picks it up. Walks back across the street and then realizes

---

[6] Detectives never recovered the murder weapon. And a National Integrated Ballistic Information Network analysis indicated that the shell casings recovered from the scene did not match those recovered from any other shooting or homicide. The prosecution, however, did introduce a photograph of Allen holding a gun that Detective Ruiz testified appeared to be either a 9-millimeter or .40-caliber Beretta firearm.

a minute later 'maybe I shouldn't have done that.' Then he throws it back down on the ground. And that's how it ends up there."

### 6. *Evidence Concerning the Shooter's Skin Color*

As noted, *ante*, Cherri Davis told detectives in a recorded interview the day after the shooting that the vehicle's driver was a "light-skinned" Mexican or Black male. The defense emphasized this evidence at trial, arguing that Allen was not "light-skinned" and therefore could not have been the shooter: "Now, it's very clear, and you can see it for yourself; Mr. Marjon Davis, first of all, he is not an Hispanic. I am an Hispanic. Okay. And he is not light-skinned."

In response, the prosecution introduced a still photograph from the surveillance video that captured the driver's hand. Detective Ruiz testified that "the skin tone [of] the driver's hand [in the photograph] appear[ed] to be consistent with . . . Allen['s]" skin tone. He conceded, however, that others might have a different opinion of the driver's skin tone.

The defense therefore presented in its case-in-chief Baylor's testimony that, in her opinion, the hand in the photograph "look[ed] like a light-skinned person."

### C. *Motion for Judgment of Acquittal Pursuant to Section 1118.1*

At the close of evidence, defense counsel moved for a judgment of acquittal for insufficient evidence, pursuant to section 1118.1.[7] Although the trial court expressed its view

---

[7] Section 1118.1 provides, in relevant part: "In a case tried before a jury, the court on motion of the defendant or on its own motion, at the close of the evidence on either side and before the

14

that the "case [was] difficult," it ultimately concluded that the prosecution had submitted sufficient evidence to permit the jury to consider the case.

### D.   *Jury Questions and Verdicts*

During deliberations, the jury made several requests, including additional clarification concerning the definition of reasonable doubt.  The jury also requested readback of testimony concerning the Swan Bloods gang, "BK" (i.e., "Blood Killer") tattoos, and the date of Officer Huacuja's prior encounter with Allen.

On October 7, 2019, the jury returned guilty verdicts on all counts charged.  It concluded further that the firearm use enhancements were true, but found the gang enhancement allegations "not true."

### E.   *Defense Motion for a New Trial*

Following his conviction, Allen retained new counsel and filed a new trial motion.  Of relevance here, Allen argued in the new trial motion that (1) Agent Easter's report constituted inadmissible hearsay, (2) his trial counsel rendered ineffective assistance by failing to object to the report, and (3) the court and jury impermissibly resolved the circumstantial evidence concerning Allen's alleged presence in the murder vehicle in favor of guilt, notwithstanding that a reasonable explanation of the circumstantial evidence pointed to Allen's innocence.  In addition, at the hearing on the motion, defense counsel noted—

---

case is submitted to the jury for decision, shall order the entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal." (§ 1118.1.)

15

and the court acknowledged—that Allen had prominent tattoos on his hands and arms. Defense counsel argued that this demonstrated that Allen was not the shooter because the driver's hand captured in the still photograph taken from the surveillance footage bore no such tattoos.

The court carefully considered Allen's arguments, even taking a recess to retrieve the trial exhibit showing the driver's hand. Ultimately, however, the court denied Allen's motion for a new trial, explaining in relevant part:

"[O]ne has to keep in mind that this [photograph] is like a freeze frame from the surveillance video, and . . . [¶] . . . I agree with the People that it's not a great photograph in terms of its clarity. And I don't think it either conclusively shows that it was the defendant or conclusively shows that it was not the defendant who was the individual that is driving the car here.

"The issue of the cell phone evidence—there was no objection. And the court does not interpose its own objections[.] . . . [¶] . . . [¶] . . . And . . . I am not convinced that [*People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*)] says that an expert that testifies cannot use an exhibit that someone else created as part of their testimony when the witness [who] is examined about the opinions says that she's formed her own opinions. [¶] And there was full cross-examination about the opinions. . . .

"[¶] . . . [¶]

"And I also feel there was and is sufficient evidence, based upon the trial record, to support the jury's verdict in this case. [¶] . . . [¶] And so I am going to deny the motion for new trial at this time, respectfully."

16

**F.** *Sentencing*

The trial court sentenced Allen to a prison term of 150 years to life on the two murder counts. The court also imposed, and then stayed, a three-year sentence in connection with the felon in possession of a firearm count.

Allen timely appealed.

## DISCUSSION

Allen mounts five challenges to his convictions, arguing: (1) Assembly Bill No. 333's amendments to section 186.22 render certain gang evidence in his case inadmissible, (2) the trial court improperly admitted Agent Easter's cell site analysis report through Agent Sparano, (3) the prosecution failed to introduce sufficient evidence at trial to support the verdicts, (4) the court erred in denying his section 1118.1 motion for a judgment of acquittal, and (5) the court erroneously denied his motion for a new trial.

**A.** *Allen Demonstrates No Prejudice from the Alleged Error in Admitting Certain Gang Evidence*

Section 186.22, subdivision (b)(1) provides for an enhanced sentence for "[a] defendant who commits a felony 'for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by gang members.' " (*People v. Sek* (2022) 74 Cal.App.5th 657, 664 (*Sek*), quoting § 186.22, subd. (b)(1).)

Assembly Bill No. 333, which took effect on January 1, 2022—after the conclusion of Allen's trial—"amended section 186.22 to impose new substantive and procedural requirements for gang allegations." (*Sek, supra*, 74 Cal.App.5th at p. 665.) "Most notably, the law defined 'to benefit, promote, further, or assist' as 'to provide a common benefit to members of a gang where the common benefit

17

is more than reputational.  Examples of a common benefit that are more than reputational may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant.' [Citation.]" (*Ibid.*)

"In addition, the law created a stricter requirement for proof of 'a pattern of criminal gang activity,' which is necessary to prove that the group with which the defendant is associated is indeed a criminal street gang.  [Citation.]  Previously, the prosecution needed to prove only that those associated with the gang had committed at least two offenses from a list of predicate crimes on separate occasions within three years of one another.  [Citation.]  Under the . . . amended law, the offense with which the defendant is currently charged cannot be used as one of the two predicate offenses.  [Citation.]  In addition, both predicate offenses must have been committed 'within three years of the date the current offense is alleged to have been committed,' by gang 'members,' and must have been for the 'common[ ] benefit[ ] [of] a criminal street gang.' [Citation.]  Finally, under Assembly Bill No. 333, the defendant may request a bifurcated trial, in which the defendant is first tried for the underlying offense, and only upon conviction is tried for any gang enhancements." (*Sek, supra,* 74 Cal.App.5th at p. 665.)

Allen contends Assembly Bill No. 333 applies retroactively to his case and renders inadmissible:  (1) evidence of the two predicate crimes committed by other Rolling 30s Crips gang members, (2) Officer Huacuja's testimony that a gang member would commit a crime like the shooting at issue to provide a reputational benefit to the gang, and (3) Officer Huacuja's testimony that he previously had "stopped [Allen] with gang members in gang territory."  He urges that the erroneous admission of this evidence caused the jury

18

to view him "in a prejudicial light" and "to resolve all doubts in favor of finding him guilty."

Allen ignores, however, that the prosecution properly introduced at trial other, more damaging gang evidence directly relevant to proving Allen's motive and intent. (See *People v. Ramos* (2022) 77 Cal.App.5th 1116, 1132 [Assembly Bill No. 333's amendments do not limit the "introduction of gang evidence in a bifurcated proceeding where the gang evidence is relevant to the underlying charges"].) This evidence included voluminous Facebook records—containing what appear to be Allen's own statements—strongly suggesting that Allen was an active member of the Rolling 30s Crips gang who sought to harm members of rival Bloods gangs; testimony that Allen's tattoos were consistent with membership in the Rolling 30s Crips; testimony that the territory of the Rolling 30s Crips and the Rolling 20s Bloods bordered one another, and that the gangs were engaged in a violent rivalry; and testimony that victim Williams's tattoos demonstrated his membership in the Rolling 20s Bloods gang.

By contrast, the gang evidence Allen now challenges on appeal was less damaging. The predicate crimes committed by other Rolling 30s Crips gang members—possession of a firearm by a felon and robbery—were far less inflammatory than the murders with which Allen was charged. Officer Huacuja's testimony concerning the reputational benefit a gang purportedly accrues when its members commit crimes was relatively brief and not incendiary. And the testimony concerning Allen's association with other Rolling 30s Crips gang members was not inflammatory; it merely provided further evidence of his membership in the gang— an issue directly relevant to Allen's motive and intent with respect to the shooting. The facts here therefore are distinguishable from those in the cases on which Allen relies for his prejudice argument.

19

(See, e.g., *People v. Albarran* (2007) 149 Cal.App.4th 214, 227–228 [reversing convictions where the prosecution introduced "extremely inflammatory gang evidence . . . which had no connection to [the charged] crimes"].)

Accordingly—even assuming that Assembly Bill No. 333 now would require the trial court to exclude the challenged gang evidence or to relegate it to the gang enhancement phase of a bifurcated trial[8]—we are not persuaded that the categories of gang evidence Allen identifies rendered his trial fundamentally unfair, or that it is reasonably probable that Allen would have obtained a more favorable result in the absence of the evidence. (See *People v. Tran* (2022) 13 Cal.5th 1169, 1209 [explaining that if gang evidence does not render trial fundamentally unfair, prejudice is evaluated under standard set forth in *People v. Watson* (1956) 46 Cal.2d 818].)[9]

### B. *Allen Fails To Demonstrate Prejudice From His Counsel's Failure To Object to the Admission of Agent Easter's Report*

Relying on *Sanchez*, *supra*, 63 Cal.4th 665, and related authority, Allen next contends that the trial court erred in admitting Agent Easter's report because it constituted testimonial hearsay, and its admission through Agent Sparano violated his rights under the Sixth Amendment's confrontation clause. (See *Sanchez*, *supra*, 63 Cal.4th at p. 686 ["When any expert relates to

---

[8] For purposes of our analysis, we assume, without deciding, that the portions of Assembly Bill No. 333 on which Allen relies apply retroactively.

[9] In light of our conclusion, we necessarily reject Allen's related contention that his trial counsel rendered ineffective assistance by failing to object to the gang evidence.

20

the jury case-specific out-of-court statements, and treats the content of those statements as true and accurate to support the expert's opinion, the statements are hearsay.  It cannot logically be maintained that the statements are not being admitted for their truth.  If the case is one in which a prosecution expert seeks to relate *testimonial* hearsay, there is a confrontation clause violation unless (1) there is a showing of unavailability and (2) the defendant had a prior opportunity for cross-examination, or forfeited that right by wrongdoing"].)

Allen does not dispute, however, that his counsel failed to object to the admission of the report at trial.  Accordingly, we conclude that Allen has forfeited this argument on appeal.  (See Evid. Code, § 353, subd. (a) ["[a] verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless:  . . . [¶] [t]here appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion"]; *People v. Stevens* (2015) 62 Cal.4th 325, 333 ["the failure to object to the admission of expert testimony or hearsay at trial forfeits an appellate claim that such evidence was improperly admitted"].)

Alternatively, Allen urges that his trial counsel rendered ineffective assistance by failing to object to the report's admission.  Even assuming, however, that his counsel erred in failing to object, Allen has failed to demonstrate the requisite prejudice.

To prevail on a claim of ineffective assistance, a defendant "must establish his counsel's representation fell below an objective standard of reasonableness and there is a reasonable probability that, but for counsel's deficient performance, the result of the trial would have been different." (*People v. Mesa* (2006) 144 Cal.App.4th 1000, 1007 (*Mesa*), citing *Strickland v. Washington*

21

(1984) 466 U.S. 668, 686–687.) " ' "The burden of sustaining a charge of inadequate or ineffective representation is upon the defendant. The proof . . . must be a demonstrable reality and not a speculative matter." [Citation.]' [Citation.]" (*Mesa, supra*, at p. 1007.)

"In considering a claim of ineffective assistance of counsel, it is not necessary to determine ' "whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." ' [Citations.] It is not sufficient to show the alleged errors may have had some conceivable effect on the trial's outcome; the defendant must demonstrate a 'reasonable probability' that absent the errors the result would have been different. [Citations]." (*Mesa, supra*, 144 Cal.App.4th at p. 1008.)

Here, Allen contends that the map in Agent Easter's report was "mislead[ing]" and prejudicial because (1) the report "suggests that [its] color-coded areas create a firm geographic area in which a phone *must* be if using a particular cell tower" (italics added), and (2) "it made the crime scene and the [location of the surveillance camera that captured video of Baylor's] car [at 1:37 p.m.] seem very close together and within [the relevant cell] tower's coverage area."

Had his trial counsel objected to the report, Allen urges, "the cell phone evidence would have consisted [only] of Agent Sparano's testimony," which he argues was "far from compelling on its own." He contends that, unlike the close proximity allegedly suggested by the map in Agent Easter's report, Agent Sparano could opine only that Allen's phone was approximately 1.5 miles from the crime scene near the time of the shooting. In addition, Allen argues that Agent Sparano's testimony that a phone typically connects to the

22

closest cell tower conflicted with Agent Easter's report because his map showed that Allen's phone did not connect to the tower closest to the surveillance camera that captured video of Baylor's car at approximately 1:37 p.m.

The record, however, belies Allen's contentions that Agent Easter's report was misleading or conflicted with Agent Sparano's testimony. First, Agent Easter's report stated expressly that its analysis "illustrate[s] an *approximate* location of the target cell phone when it initiated contact with the network." (Italics added.) This is consistent with Agent Sparano's testimony that she could opine only as to the approximate location of Allen's phone. Second, Agent Easter's map contains a legend indicating its scale, and it appears accurately to reflect the distance between the crime scene and the surveillance camera that captured video of Baylor's car at approximately 1:37 p.m. Third, Agent Sparano's testimony that a phone typically connects to the nearest cell tower did not conflict with the map in Agent Easter's report. Agent Sparano expressly testified that it is "not always the case" that a phone connects to the nearest tower "due to natural landscapes, if there's buildings that are shooting up." And she testified—based on her own, independent analysis—she agreed with the visual depictions in Agent Easter's map.

Accordingly, we conclude that Agent Sparano's testimony was entirely consistent with the contents of Agent Easter's report. Thus, even had Allen's counsel successfully moved to exclude the report at trial, the jury still would have heard persuasive cell site analysis testimony placing Allen within 1.5 miles of the crime scene approximately five minutes following the shooting. Although we agree with Allen that the map in Agent Easter's report may have assisted the jury in evaluating the cell site analysis evidence, we are not convinced that there is "a 'reasonable probability' that

23

absent" admission of Agent Easter's report "the result" of Allen's trial "would have been different." (*Mesa*, *supra*, 144 Cal.App.4th at p. 1008.)

## C. *Sufficient Evidence Supports the Verdicts*

We also are unpersuaded by Allen's contention we must overturn his convictions because the prosecution introduced insufficient evidence at trial identifying him as the shooter.

"When reviewing a challenge to the sufficiency of the evidence, we ask ' "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' [Citations.] Because the sufficiency of the evidence is ultimately a legal question, we must examine the record independently for ' "substantial evidence—that is, evidence which is reasonable, credible, and of solid value" ' that would support a finding beyond a reasonable doubt." (*People v. Banks* (2015) 61 Cal.4th 788, 804.)

The prosecution's case consisted of four key categories of evidence: (1) evidence reflecting Allen's membership in the Rolling 30s Crips gang, including his tattoos and statements from his Facebook page suggesting his desire to commit violence against members of rival Bloods gangs, (2) evidence indicating that victim Williams was a member of the rival Rolling 20s Bloods gang, (3) surveillance camera footage and eyewitness testimony identifying Baylor's car as the murder vehicle, along with testimony, Facebook posts, and a traffic citation demonstrating that Allen regularly had access to Baylor's car, and (4) cellular site analysis evidence suggesting that Allen's phone was within 1.5 miles of the murder scene at approximately 1:37 p.m., five

24

minutes after the shooting, and then continued to travel west, in the same direction as Baylor's car.

This evidence established that Allen had both a motive and an opportunity to commit the shooting. Accordingly—although we agree with Allen that the evidence of his guilt was not overwhelming—we conclude that the prosecution offered sufficient evidence to permit a rational trier of fact to convict him. We reject Allen's various arguments to the contrary.

First, Allen contends that we should disregard the gang evidence because it was inadmissible. We are unpersuaded by this argument for the reasons set forth in the Discussion *ante*, part A.

Second, although Allen concedes the prosecution "persuasively prove[d] . . . Baylor's car was used in the shooting" and that Allen had regular access to the car, he urges that this evidence is not "dispositive in proving [his guilt] beyond a reasonable doubt." But the prosecution need not support its case with a single piece of dispositive evidence. Instead, it may— as it did here—establish a defendant's guilt by introducing a variety of evidence that suggests culpability when considered as a whole.

Third, Allen argues that the cellular site analysis evidence "is entitled to no weight" because it is consistent with someone else having driven the car immediately following the shooting. In particular, he argues that (1) at 1:37 p.m., his phone did not connect to the cell tower closest to the alleged location of Baylor's car at that time, and (2) although his phone was traveling west between 1:37 p.m. and 1:54 p.m., the surveillance camera evidence failed to prove conclusively that Baylor's car continued to travel west during that time frame. He argues further that "[a]t minimum, the evidence creates two reasonable conclusions . . . which mandated that the jury adopt the conclusion that supported a finding of innocence." Agent Sparano's testimony, however, offered

a reasonable explanation concerning why a phone might not connect to the closest cell tower, and the available surveillance video evidence suggested that Baylor's car was traveling west. We therefore are not persuaded that the circumstantial evidence identifying Allen as the driver of the murder vehicle—which included not only the cell site analysis, but substantial testimony and documentary evidence establishing Allen's regular access to Baylor's car—gives rise to a reasonable conclusion supporting his innocence.

Fourth and finally, Allen urges that the DNA evidence, as well as evidence establishing the shooter was "light-skinned," should exonerate him. But like the trial court, we find the DNA evidence of little utility. There simply is insufficient evidence of the provenance of the lip balm recovered from the crime scene to render it relevant.

We find the evidence concerning the driver's skin color similarly inconclusive. Only one eyewitness, Cherri Davis, purportedly saw the driver's skin color on the day of the shooting. Although Davis initially told detectives that she believed the driver was "light-skinned," she denied making such a statement when she testified at trial.

Apart from Davis's testimony, the only direct evidence of the driver's skin color comes from a still photograph of the driver's hand taken from one of the surveillance videos. Detective Ruiz testified that, in his opinion, the photograph depicted a hand consistent with Allen's skin color, although he conceded that others might have a different opinion. By contrast, Baylor testified that she viewed the photograph as depicting someone "light-skinned." At most, this evidence establishes that the driver's skin tone was susceptible to multiple interpretations. We therefore are not persuaded that this

26

evidence undercuts the sufficiency of the remaining evidence supporting Allen's guilt.

Accordingly, we conclude that sufficient evidence supports the verdicts.

### D. *The Trial Court Properly Denied Allen's Motion for a Judgment of Acquittal*

"An appellate court reviews the denial of a section 1118.1 motion [for a judgment of acquittal for insufficient evidence] under the standard employed in reviewing the sufficiency of the evidence to support a conviction." (*People v. Houston* (2012) 54 Cal.4th 1186, 1215.)

In arguing the trial court improperly denied his section 1118.1 motion, Allen largely repeats the arguments he makes challenging the reliability of the cell site analysis evidence and the sufficiency of the remaining trial evidence on appeal. For the reasons set forth in the Discussion *ante*, parts B and C, we conclude that the trial court properly denied Allen's motion for a judgment of acquittal.

### E. *The Trial Court Did Not Err in Denying Allen's Motion for a New Trial*

Finally, Allen urges that we must reverse the trial court's denial of his new trial motion because the court (1) failed to conduct the proper analysis in determining whether Agent Easter's report was testimonial hearsay, (2) erred in finding that [Allen's] trial counsel was not ineffective for failing to object to the admission of Agent Easter's report, and (3) erred in disregarding evidence that the driver of the murder vehicle was "light-skinned."

Applying de novo review, we find each of Allen's contentions unpersuasive. (*People v. Ault* (2004) 33 Cal.4th 1250, 1262 [an appellate court reviews denial of a motion for a new trial de novo].)

We reject Allen's first two contentions for the reasons set forth in the Discussion *ante*, part B. And we reject Allen's final contention because it simply is not supported by the record. The trial court expressly considered the evidence suggesting the driver was "light-skinned" in ruling on the new trial motion; indeed, the court retrieved the relevant trial exhibit during argument so that it could again examine the photograph of the driver's hand. After carefully considering the evidence, it concluded—as do we—that it was not dispositive.

Accordingly, we conclude the trial court did not err in denying Allen's motion for a new trial.

## DISPOSITION

The April 28, 2021 judgment is affirmed.

<u>NOT TO BE PUBLISHED</u>.

ROTHSCHILD, P. J.

We concur:

CHANEY, J.

WEINGART, J.

29